Poonja Kungar, M.D. This is the 1st District, 2nd Division of the Appellate Court. Before you, you have Justice Cobb, Justice Smith, and Justice Lavin. Again, Poonja Kungar versus the Department of Health. Our procedure is as follows. First, the appellant will have their opportunity to present their case, and we do not interrupt. We let you put your case on, and then we ask questions after. Then the appellee will present their case, and it's the same. You have a chance to finish your case, and then we ask questions. Then the appellant again, and then we're done. With that in mind, you may proceed. Thank you, Your Honor. Nancy Temple for Dr. Poonja Kungar. May it please the court. This is a unique case involving a successful, highly qualified physician, and actions by the department beyond the scope of its enabling act, the Medical Practice Act, and its own regulations interpreting the act. As a result, we have a very lengthy hearing, the longest the department has said that is ever conducted, with due process violations resulting in excessive and arbitrary and capricious sanctions against Dr. Kungar. Dr. Kungar was a distinguished pediatric fellow, board certified in pediatrics, who practiced medicine successfully without any blemish on her career in different professional settings for 12 years. She was accredited at several respected hospitals, including La Robita, Edwards, Advocate, Norwegian American Hospital. She successfully credentialed and completed three full employment contracts, including at federally qualified healthcare facilities. She served the underprivileged communities in the Chicagoland area. No fewer than nearly two dozen former professional colleagues, including pediatricians, supervisors, nurses, physician's assistants, medical assistants, all of whom worked directly with Dr. Kungar and personally observed her interact with patients, co-workers, and colleagues, both senior to her, her peers, and those who were not physicians but were nurses, medical assistants, or other staff people. They voluntarily came to the hearing to testify in person in support of her professionalism. One even traveled from California, and one traveled from Ohio. He used to work in the The other professionals are all located in Illinois who testified, and they were courageous enough to testify truthfully before the department, which governs and disciplines their own individual licenses as well. This case presents unique due process issues, as I mentioned, and the record reflects that Dr. Kungar did not get a fair hearing, and the department did not prove the accounts of the third amended complaint with clear and We had set out the process and the proceedings, which are fairly complicated in our opening brief. There was not a single malpractice claim against Dr. Kungar, no judgment, no cases. There were no patient or co-worker complaints at any of the hospitals that she worked as a when she didn't need her hospital privileges anymore. She worked at Aunt Martha's from 2013 through 2014, and then Access Community Health from 2014, the summer of 2014 until December 2016. She had studied Spanish and become fluent in order to serve the Hispanic-speaking community that was served by Aunt Martha's and Access Community Health. She successfully completed her two-year contract at Access in 2016, and significantly, her supervisor, the regional medical director, Dr. Charles Barron, who testified, signed off on her recredentialing application and approved her for a reappointment, as did the chief medical officer, in writing, and the board of Access in June and July of 2016. Access sent her a written contract, additional two-year contract for 2016 through 2018, to sign in September 2016. The IDF PR matter that were here before your honors today came to Access's, her employer's in the summer of 2016. And like I said, we set out the process here. This IDF PR matter, the department matter, originated, the whole genesis of it, stems from the fallout of a personal relationship with a former friend, Monu Bedi, who happens to be a lawyer as well. There was no dispute. He was never a patient. He was never affiliated with any patient. It was a purely private social relationship that the two of them had. They dined and attended parties together in 2012. That relationship had a falling out. There were absolutely no communications after January 2014. Mr. Bedi admitted that he was sorry about upsetting or misleading Dr. Coongar in a text message to her. And that's in the record at page 1636. He admitted at the hearing that he never experienced any harm or even any threat of any harm from Dr. Coongar. He had no complaints nor any information about her ability to provide patient care or practice medicine whatsoever. He presented the department in the summer of 2014 with a series of communications he had received that he had selected himself. And he omitted any of the communications that he had sent to Dr. Coongar. He presented those to the department and submitted a complaint to the department. He did not notify Dr. Coongar, obviously, of that complaint. At the hearing, there was evidence presented from AT&T that he had initiated communications calls and texts totaling over 200 minutes to Dr. Coongar. But we don't have those because he destroyed all of his text messages. There's evidence, however, of some sort of a difficult relationship between the two of them. Dr. Coongar has expressed remorse and regret for sending her communications to him. But at the time, she expected it would be completely private in between the two of them and had nothing to do with patient care or the practice of medicine. In January 2014, after they ran into each other at a social outing in the city of Chicago in 2013, in January 2014, Dr. Coongar notified Mr. Beatty that she had contacted DePaul University where he was an associate professor seeking tenure and notified them that he had been dating a law school student. He admitted he was concerned about his tenure. And so then he began a course of legal proceedings against Dr. Coongar. He first filed a petition for no contact in January 2014. The record reflects in the certified court orders we submitted in evidence that that petition was denied for lack of sufficient evidence. He refiled the petition and continued the legal proceedings on multiple occasions from January 2014 through April 2014, forcing Dr. Coongar to retain counsel, take multiple dates off of work and appear in court. By April 2014, she had decided to agree to a stipulated no contact order because she just wanted to stop it. So she agreed and that was entered in April 2014. Promptly after that was entered, he filed a civil defamation lawsuit against her in the law division. In that case, that case was settled and dismissed in September of 2014. There was no discovery, no finding. That was purely allegations. At the hearing, Mr. Beatty admitted that he suffered absolutely no damages. He never produced any information or facts or evidence. There was no evidentiary hearing ever in the no contact proceeding, nothing in the defamation litigation. It was settled for $4,000, which I submit as nuisance value so that Dr. Coongar could close that out and be done and not pay any more legal fees. Unbeknownst to her, she thought this was the end of it when she settled with Mr. Beatty, the civil complaint of defamation in September 2014. But unbeknownst to her, he submitted a to the Illinois Department of Financial and Professional Regulation, which opened up an investigation like it does with all confidential complaints. And ultimately, it took on a life of its own and resulted in the hearing that were before your honors today. The record reflects that the department repeatedly and the findings by the ALJ repeatedly misstate what actually happened with Mr. Beatty's no contact order. There's characterizations that a court somehow entered a no stalking order, that there's characterizations that Dr. Coongar had violated the no contact order. I want to be clear. The certified copies of all the court pleadings and the court orders regarding the no contact petition and proceeding, there was absolutely no hearing, no finding, no evidence, and no order ever finding that Dr. Coongar ever violated the agreed upon no contact. Okay. Counsel, you've spent 15 minutes already going over the facts over and over and over again. Why don't we get to some legal analysis here? Okay. First of all, we're all in agreement here. I think we should be. This matter was heard by two different ALJs. The second one was welcomed by you and your client, by your client. Then the IDPFR or FPR, the medical disciplinary board heard it, reviewed it. Then it was reviewed by the director before it went to the circuit court. But what we are reviewing here today, okay, is the decision of the director legally, correct? In terms of what's subject to review. It is correct. However, the director adopted what the board adopted and the board adopted what the ALJ adopted. The board members did not attend the hearing. That's the way it always goes. But in terms of review, we're not reviewing what the ALJ did, their decisions. We're reviewing the director and we're not reviewing necessarily the circuit court's decision. It's what the director did. That is the subject of review in this administrative law case, correct? Yes. Yes, your honor. The director, however, did not attend the hearing, did not make any credibility findings. Answer, just answer the questions asked. Okay. So what we're talking about here is the fifth level of review that Dr. Kungar has gotten regarding these issues that you talked about at some great length. Is that correct? Yes. All right. You say that she had a private social relationship with Dr. is it Betty or Beatty? Beatty. Beatty. Okay. It's in between. The administrative rules here state that activities that cause quote actual harm to any member of the unethical or unprofessional conduct. And how was her stalking behavior not harmful to Beatty? He admitted he suffered no damage and that he had no physical harm whatsoever and never feared of any physical harm. There was no violence. It was just emails and texts. He had to go to court to answer the questions asked. And how about her behavior with regards to her behavior and words with the sheriff's deputies? Are those not harmful under the language of the act that we're talking about here today? It was language. There was no physical harm. She apologized for it and that was expunged from her record which the department does not even consider is barred from considering under the law in licensing. Despite the significance of his protective order in this case, tell us why the director could not rely on evidence relating to Dr. Kungar's treatment of the sheriffs even if her related arrest was expunged. Well, the rest was based on the allegations and there was a factual dispute regarding the allegations. The officers, Mr. Beatty in court told the officers, which was incorrect, that Dr. Kungar had been taking photographs in the courtroom. They seized the phone and they the officers testified that they understood that she was upset and why. She suffered some bruises. They didn't suffer any physical injury and they accepted her apology. Two things here, giving you credit for substantially for what you've indicated, two things you didn't disclose is you didn't disclose the pending actions which she did not disclose against her when she filed for a job. That's one. And the second one, she went and used unauthorized records of other patients. You didn't disclose that either. So these are two issues you didn't address. Okay. First, the no pending actions disclosed. We did address the form. It says, disclose any quote disciplinary action, close quote. That's the credentialing form. And we did address in our brief that the medical practice act defines in section two, and it's in our disciplinary action means revocation, suspension, probation, supervision, practice, modification, reprimand, required education, fines, or any other action taken by the department against a person holding a license. The first disciplinary action that occurred was not until the emergency suspension, January 30, 2017. And at the time this credentialing form was filled out in April, 2016, there was no disciplinary action as defined by the medical practice act. And we addressed that in our opening brief. Second, unauthorized records use. That refers to while she was employed at access in August, 2015, which was almost a year and a half after her a telephone number of a coworker that was in a medical record. She testified and explained both in the circumstances to her employer at the time and at the hearing that she accessed this phone number because a coworker did not show up at work. It was an unexplained absence. And there have been background information where there was potential concern for the physical wellbeing of this employee. And she was trying to get ahold of her to make sure she was okay. She acknowledged that she would not do it again. And there's no evidence that she took any health information or use any health information. It was a telephone number and there there's no evidence that it ever occurred again. And it was not the purported reason for termination in December, 2016. Ms. Temple, we've listened for quite a few minutes here now to all of the alleged infractions or misconduct to which you offer an explanation or rationale. But what I'm hearing and what I'm reading from the brief is there has been just an ongoing series of events, whether they cause any physical harm or not, that put in question Dr. Coongar's ability to practice in what is expected to be the most professional means. You mentioned access and you mentioned Aunt Martha's. There were issues that occurred at both places of employment, yet you set forth that there were no incidents. I'm hearing a complete series of events over a doctor is suspended, the license is not revoked. Right. And so let's talk about that, what the record actually shows. At Aunt Martha's, she presented testimony of Erica Hunter, who testified that she supervised physicians and all the staff and worked directly personally with Dr. Coongar at the Aunt Martha's facility. The only testimony presented by the department was hearsay by Dr. Lim at Aunt Martha's, who worked in a different Aunt Martha's facility, so didn't physically work with Dr. Coongar. And Dr. Lim, all of her statements were hearsay. What are the rules of evidence applicable to an administrative proceeding? Yes, I submit that it is. If it's being offered for the truth of the matter, and it goes to the heart of this as to whether there's any sort of concern about her practice of medicine, all of the five people from Aunt Martha's that Dr. Coongar called as witnesses, each one of them testified that they worked directly with Dr. Coongar, saw her in patient settings. The nurses, the physician's assistants, the medical assistants who were actually in the room with her and interact with her on a day-to-day basis, they all testified that she was professional. She didn't do anything inappropriate. And they wrote letters of recommendation and commendation to her that are in the record. There's not a single... But Dr. Coongar wouldn't even write a letter of recommendation for her for another job because of her conduct. And then wasn't there some negative repercussion as a result of her good friend declining to write a letter or offer a letter of reference on her behalf? I don't believe that there is anything in the record about somebody refusing to write a letter of recommendation. We have all of the nurses, Erica Hunter, Ebony Davidson, Adam Franco, and the doctors, Dr. Glab and Dr. Bird, who testified positively and she got good performance evaluations. When we move from Aunt Martha's to ACCESS, again, the people who worked directly with her testified positively. The only person who testified against her was a peer of hers, Dr. Tara DeJesus, who had filed a lawsuit against Dr. Coongar in the summer of 2016. And there's evidence of potential bias. The document that the department and Dr. DeJesus relied on was called Department's Exhibit NN from ACCESS. All right, that's enough. Are there any further questions? No. Appellee, you may proceed. May it please the court, Assistant Attorney General Priyanka Gupta for Defendant Appellee's Illinois- Now I know how to say that. Yes. Department of Financial and Professional Regulation and the Director of its Division of Professional Regulation. Our state's Medical Practice Act requires physicians to exhibit good moral character in order to practice in Illinois. To this end, the act prohibits a variety of conduct that falls below this ethical standard. If a physician violates the act, then the department is responsible for taking disciplinary action to protect the public health, welfare and trust. Here, the director determined that Dr. Coongar committed multiple violations of the act and so entered an indefinite suspension of her license for 18 months, at least 18 months. That decision is afforded significant deference on administrative review and should be affirmed. I'd like to start by clarifying the standard of review, which is of course well settled, which is that this court reviews the director's determination for clear error in applying the facts to the law and for the factual findings, whether they are against the manifest weight of the evidence. Right now in argument, as in the brief, my opposing counsel focuses on testimony that was favorable to Dr. Coongar that the director did not credit. And so she asked this that that is not within this court's scope of review on direct administrative review. Next, Dr. Coongar claims that her actions against Dr. Beatty were, I'm sorry, Beatty were outside the scope of the Medical Practice Act because it involved a private social relationship. However, as this court has just explained in argument, the Medical Practice Act prohibits dishonorable, unethical or unprofessional conduct of a character likely to harm the public. Nothing in this statute limits that behavior to occurring in the course of providing medical care or practicing medicine. And in fact, the statute that's 225 ILC 60 slash 22 provides other bases for disciplinary action that do not ostensibly require the practice of medicine. For example, the department can take disciplinary action based upon a felony conviction, or if a physician fails to file tax returns. So Dr. Coongar is asking this court to read a limitation into the act that does not exist. And of course, that runs contrary to the basic principles of statutory interpretation. Next, I would like to clarify the record on the 2016 access credentialing form that this court inquired about. That form is that C 1386 of the record and asks whether quote, any disciplinary actions or proceedings been instituted against you and or any disciplinary actions or proceedings now pending. So the question was not whether any disciplinary action had been completed as my opposing counsel represents, but instead whether these proceedings had been instituted or occurred. And at the time, or repenting, I'm sorry. And at the time, Dr. Coongar filled out this form in April 2016, the department had instituted the instant proceeding back in February 2016. And so she did misrepresent misrepresent her disciplinary status when filling out this form. I next like to answer Justice Cobb's question about a co worker refusing to provide a reference for Dr. Coongar. I believe the court was referring to Dr. Day who's is the department, the director found that the department approved the count five involving Dr. Day who's is with clear and convincing evidence. Dr. Coongar does not challenge this determination on administrative review. And so she has forfeited any challenge to count five involving Dr. Day who's is. Next, and just briefly, I'd like to touch on the ex parte suspension that occurred during the administrative hearing. Dr. Coongar has received the relief that she saw, which was that her license would be restored during the administrative hearing. She says in her reply brief that this request for relief is not moot because she is entitled to damages. But she did not request damages and her complaint for administrative review before the circuit court. And that makes sense given that the administrative review law does not provide for damages on direct administrative review. And so her claim for damages that she has brought up at the 11th hour does not save her claim regarding this ex parte suspension. And now because there are a lot of issues in this case, I'm happy to wrap up my argument and answer any questions that this court might have. Questions? None. I have no questions. Nor do I. So Nancy, you may proceed. Thank you. Briefly, the dishonorable, unethical, or unprofessional conduct the department defines in its administrative code in 1285.240, the standards, and none of those, we pointed out none of those standards apply to this record here. The credentialing application form about the institution of proceedings, the evidence is that a formal complaint was filed and assigned a number in February 2016. At that time, Dr. Coongar, the complaint was never served on her 2016. The claim for damages, we just pointed out that legally, we have a conundrum here where in January 2017, the department imposed the emergency ex parte suspension. And the standard in the statute says the department can do so if it has evidence of some emergency and imminent danger. And we pointed out what the evidence was in existence at that time, and that there wasn't a basis for the emergency suspension. Dr. Coongar was on pro se at the time. And we successfully demanded a hearing immediately. It wasn't provided sufficiently, which is the separate due process violation in the vacation. But as the circuit court opined and stated and ruled in July 2017, when she vacated the emergency suspension, she wasn't determining whether that was properly timely provided and completed the hearing to determine whether an emergency existed. And after all the hearing there, we established that the record did not show that there was an emergency basis in January 2017. That's why we're asking for the legal review that there wasn't a basis. And the reason why it's important and it's not moot is because if there wasn't a proper emergency basis, she might theoretically be entitled to damages. We're asking for the liability determination first. The final note is Dr. Argumento, the forensic psychiatrist that was retained by respondent to conduct an independent evaluation and provide an on over 50 times. And in fact, had been hired by the department as its own forensic psych expert in the past. She opined and her opinion did not change at the hearing that Dr. Coongar did not suffer from any mental impairment such that she could not reasonably practice medicine safely. In fact, she opined that Dr. Coongar's identity and work as a physician has had a stabilizing influence on her life and that the distress and all the incidents and inappropriate conduct with regard to Mr. Beatty all stemmed from issues concerning Mr. Beatty, which ended years ago and nothing has happened since then. Fortunately, Dr. Coongar, although she hasn't been able to practice medicine and the department has not acted on her petition to restore her license, even though nearly four years have passed, she continues to remain positive. And we're just asking for the department to follow the medical practice act and focus on the practice of medicine here. We don't believe that there's clear and convincing evidence of any mental impairment given Dr. Argumento's opinion, Dr. Dinwiddie's admission that she might have a mental impairment. All right. Thank you. You both have done the best you can with a very strange case. I appreciate both sides to make this as clear as I can and we'll let you know the outcome within a few days. Thank you. Thank you. We're adjourned.